**UNITED STATES DISCTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

Jovascea Williams-Roberts and
Avishoov Roberts,

        Plaintiffs,

        v.

Coloplast Corp., et al.,

        Defendants.

Civil Action No. 2:19-cv-42

COMPLAINT AND JURY DEMAND

**COMPLAINT**

      COME NOW Plaintiffs, Jovascea Williams-Roberts and Avishoov Roberts ("Plaintiffs"), who by and through the undersigned counsel hereby submit this Complaint and Jury Demand against Coloplast Corp., Mentor Worldwide LLC, Coloplast A/S, Coloplast Manufacturing US, LLC, Porges S.A., ("Defendants") for compensatory and punitive damages, equitable relief, and such other relief deemed just and proper arising from Plaintiff Jovascea Williams-Roberts's injuries from her pelvic mesh implant manufactured by Defendants.  In support of this Complaint, Plaintiffs allege the following.

**PARTIES**

**A.  Plaintiffs**

      1.     Plaintiff Jovascea Williams-Roberts is a citizen of the United States and citizen and resident of Hammond, Lake County, Indiana.  All references to "Plaintiff" in the singular refer to Plaintiff Jovascea Williams-Roberts.

      2.     Plaintiff Avishoov Roberts is a citizen of the United States and citizen and resident of Hammond, Lake County, Indiana.  Plaintiff Avishoov Roberts is the spouse of Plaintiff Jovascea Williams-Roberts.

**B. Defendants**

3.      Defendant Coloplast Corp. ("Coloplast Corp.") is a corporation organized and existing under the laws of Delaware, maintaining its principal place of business at 1601 West River Road North, Minneapolis, Minnesota 55411. Coloplast Corp. is a wholly-owned U.S. sales and marketing subsidiary of Coloplast A/S, a Denmark corporation. Colopolast Corp. is a citizen of Delaware and Minnesota.

4.      Defendant Mentor Worldwide LLC ("Mentor Worldwide") is a limited liability corporation organized under the laws of Delaware, with a principal place of business at 5425 Hollister Avenue, Santa Barbara, California 93111.  Mentor Worldwide's sole member is Ethicon, Inc., a corporation organized and existing under New Jersey law, maintaining its principal place of business at 555 US Route 22, Somerville, New Jersey 08876.  Ethicon, Inc. is a wholly owned subsidiary of Johnson & Johnson, a corporation organized and existing under the laws of New Jersey, maintaining its principal place of business at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey 089333.  Therefore, Mentor Worldwide is a citizen of New Jersey.

5.      Defendant Coloplast A/S ("Coloplast A/S") is a corporation organized and existing under the laws of the Kingdom of Denmark maintaining its principal place of business at Holtedam 1, Humlebaek 3050, Kingdom of Denmark.  Coloplast A/S is a citizen of Denmark.

6.      Defendant Coloplast Manufacturing US, LLC ("Coloplast Mfg.") is a limited liability corporation organized and existing under Delaware law, maintaining its principal place of business as 1940 Commerce Drive, North Mankato, Minnesota 56002. Coloplast Mfg.'s sole member is Coloplast Corp., which is a corporation organized and existing under

2

the laws of Delaware, maintaining its principal place of business at 1601 West River Road North, Minneapolis, Minnesota 55411.  Therefore, Coloplast Mfg. is a citizen of Delaware and Minnesota.

7.     Defendant Porges S.A. ("Porges") is a corporation organized and existing under the laws of the France maintaining its principal place of business at Centre d'affaires La Boursidière 92357 Le Plessis-Robinson cdx., France. Porges is a wholly owned subsidiary of Coloplast A/S.  Porges is a citizen of France.

8.     Coloplast Corp., Coloplast A/S, Coloplast Mfg., Mentor Worldwide, and Porges, are collectively referred to herein as the "Coloplast Defendants" or "Defendants".

9.     All acts and omissions of the above-referenced Defendants as described herein were done by its agents, servants, employees, and/or owners, acting in the course and scope of their respective agencies, services, employments, and/or ownership.

## JURISDICTION AND VENUE

10.     Federal subject matter jurisdiction is based upon 28 U.S.C. § 1332(a), in that there is complete diversity among Plaintiffs and Defendants and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

11.     Defendants have significant contacts with this federal judicial district therefore they are subject to the personal jurisdiction of the Court in this district. A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in this federal judicial district and therefore, pursuant to 28 U.S.C. § 1391(a), venue is proper in this district.

## FACTUAL BACKGROUND

### A.  General History of Pelvic Mesh Products

12.     Surgical mesh products have been used to repair abdominal hernias since the

1950s. In the 1970s, gynecologists began using surgical mesh products designed for abdominal hernia repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). Manufacturers, including Defendants, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and SUI.

13.     A pelvic organ prolapse occurs when a pelvic organ, such as the bladder, drops ("prolapses") from its normal position and pushes against the walls of the vagina. Prolapse can happen if the muscles that hold the pelvic organs in place become weak or stretched from childbirth or surgery. More than one pelvic organ can prolapse at the same time. Organs that can be involved in a pelvic organ prolapse include the bladder, the uterus, the bowel and the rectum.

14.     Defendants' pelvic mesh products are targeted for women who suffer from pelvic organ prolapse and stress urinary incontinence as a result of the weakening or damage caused to the walls of the vagina. These products are specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma and minimal pain while correcting vaginal prolapse, stress urinary incontinence, pelvic organ prolapse and/or rectocele.

15.     Surgical mesh, including mesh used in pelvic mesh products, is a medical device that is generally used to repair weakened or damaged tissue. It is made from porous absorbable or non-absorbable synthetic material or absorbable biologic material. In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to repair pelvic organ prolapse or to support the urethra to treat urinary

incontinence. Most pelvic mesh products are comprised of non-absorbable, synthetic, monofilament polypropylene mesh and/or collagen.

16.     Defendants sell pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The products manufactured by Defendants are considered Class II medical devices.

17.     These pelvic mesh products contain polypropylene mesh. Despite claims that this material is inert, the scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendants' pelvic mesh products. This immune response promotes degradation of the polypropylene mesh, as well as the pelvic tissue, and can contribute to severe adverse reactions to the mesh.

18.     Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' pelvic mesh products. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, and causes chronic inflammation of the pelvic tissue, shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain. It also can cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

19.     Furthermore, pelvic mesh products containing collagen cause hyper-

inflammatory responses leading to problems including chronic pain and fibrotic reaction. Defendants' collagen-containing products disintegrate after implantation into the female pelvis. The collagen-containing products cause adverse tissue reactions, and are causally related to infection, as the collagen is a foreign organic material. Cross linked collagen is harsh upon the female pelvic tissues; it hardens the bodily tissues.

20.     When these pelvic mesh products are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

21.     In 1996, the FDA cleared the first pelvic mesh products for use in the treatment of stress urinary incontinence (SUI). These products include products manufactured, marketed, and distributed by Defendants. These products were approved by the FDA under the abbreviated 510(k) approval process. Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed before May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the pelvic mesh products.

22.     At various times, Defendants sought and obtained Food and Drug Administration ("FDA") clearance to market the pelvic mesh products under Section 510(k) of the Medical Device Amendment. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. This clearance process did not require Defendants to prove the safety or efficacy of the pelvic mesh products and, thus, a formal review of the safety and efficacy of the pelvic mesh products was never conducted with regard to the products.

23.     Defendants' pelvic mesh products have been and continue to be marketed to the

medical community and directly to patients as safe, effective, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse and/or rectocele, and as safer and more effective as compared to the traditional products and procedures for treatment, and other competing pelvic mesh products.

24.     The Defendants have marketed and sold the pelvic mesh products to the medical community at large and directly to patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and include the provision of valuable cash and non-cash benefits to health care providers.

25.     Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of the pelvic mesh products. Defendants' further engaged in direct-to-consumer marketing specifically designed to drive consumers to seek out these products for implantation into their bodies.

**B**.  **The Coloplast Defendants' Pelvic Mesh Products**

26.     At all times material to this action, the Coloplast Defendants were in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, *inter alia*, within the United States, either directly or indirectly through third parties, subsidiaries or related entities, pelvic mesh products.

27.     Each of these products was cleared for sale in the United States after the Defendants made assertions to the Food and Drug Administration of "Substantial

Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

28.     The products include those known as T-Sling-Universal Polypropylene Sling, Aris-Transobturator Sling System, Supris-Suprapubic Sling System**,** Novasilk-Synthetic Flat Mesh, Exair-Prolapse Repair System, Restorelle, Smartmesh, Omnisure, and Minitape as well as any variations of these products and any unnamed Coloplast pelvic mesh product designed and sold for similar purposes, inclusive of the instruments and procedures for implementation.

29.     On February 8, 2001, Mentor announced the purchase of Porges S.A., a subsidiary of Sanofi-Synthelabo. At the time, Porges held the leading market share for urological p r o d u c t s  in France and held a strong position throughout Europe was one of the largest manufacturers of urological products, supplying a complete range of products including pelvic mesh products.

30.     In May 2005, Mentor announced the U.S. launch of its new Aris$^{(TM)}$ Trans-Obturator Tape. According to Mentor's launch reports, "specifically designed to utilize Mentor's patented Trans-Obturator Technique (T.O.T.$^{(TM)}$), Aris represents the newest technical achievement and advanced generation of trans-obturator slings for the treatment of stress urinary incontinence in women." "The introduction of Aris furthers Mentor's position as a pioneer of the trans-obturator method for treating stress incontinence in women," commented Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation. "We are committed to driving innovation in the field of women's health to provide better solutions for physicians and the patients they serve." Analytic Biosurgical Solutions ("ABISS") FDA registration lists its proprietary device as "Mentor Aris Trans-Obturator Tape and

Surgical Kit."

31.     On October 12, 2005, ABISS and Mentor entered into a number of agreements pursuant to which ABISS licensed a number of ABISS' products to Mentor, which were thereafter marketed by Mentor under its trademarks, including its Aris trademark. On June 2, 2006, Mentor sold its surgical, urological, clinical and consumer healthcare business segments to Coloplast for $461,145,398, including *inter alia*, Mentor's October 12, 2005 agreements with ABISS and Mentor's Aris and Novasilk pelvic mesh products.

32.     At all times, the product marketed and sold in the United States as "Mentor Aris Trans-Obturator Tape and Surgical Kit" was manufactured by ABISS and, at all times after October 2, 2006, the product "Mentor Aris Trans-Obturator Tape and Surgical Kit" was exclusively marketed and sold in the United States by Coloplast Corp. from its principal place of business in Minneapolis, Minnesota.

33.     ABISS is registered with the FDA, Registration Number 3004756681, as the manufacturer of "Mentor Aris Trans-Obturator Tape and Surgical Kit."

34.     On December 5, 2005, Mentor obtained 510(k) clearance for Mentor NovaSilk Mesh. Mentor NovaSilk Mesh is a permanent, synthetic knitted propylene mesh that is square in shape and is a sterile, single use device. The Mentor NovaSilk Mesh obtained 510(k) clearance based on substantial equivalence in material, function, performance, and design to the Gynemesh Prolene Soft (Polypropylene) Mesh cleared under 510(k) K013718 and knitted polypropylene already in use under Mentor's Aris Sling cleared under 510(k) K050148. Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation commented, "The addition of NovaSilk to Mentor's expanding portfolio of women's health products for pelvic organ prolapse or stress urinary incontinence reinforces the

commitment of our urology franchise to surgeons and the patients they serve by providing high quality product offerings and customer service and support."

36. Coloplast Corp.'s annual report for 2009-2010 reported that "the majority of our acquired patents and trademarks are associated with the acquisition of Mentor's urology, business in 2006." The annual report also said that Mentor signed "a non-competition clause prohibiting Mentor (the seller) from selling urology products for the next seven years…."

36. Coloplast Corp. began marketing the Exair Prolapse Repair System in May 2009 to treat pelvic organ prolapse. This product is made of NovaSilk Mesh, precut into the necessary shape with four mesh arms extending from the main body, which are used to implant the device. This product obtained 510(k) clearance based on its substantial equivalence with Coloplast Corp.'s (formerly Mentor's) NovaSilk Mesh, and Gynecare Prolift Total Pelvic Floor Repair System cleared under pre-market notification number K071512 on May 15, 2008.

37. Coloplast A/S received 510(k) clearance for the Supris Retropubic Sling System 510(k) K111233 in June 2011, as a device substantially equivalent to the Mentor Aris Suprapubic Surgical Kit.

38. On October 29, 2010, Coloplast Corp. acquired Mpathy Medical Devices, Inc. ("Mpathy"). Mpathy was founded in 2003, with the aim of developing less invasive surgical solutions for the treatment of female stress urinary incontinence and pelvic organ prolapse. Mpathy's core product lines included Minitape® and Omnisure® for stress urinary incontinence, and the Restorelle® family for pelvic organ prolapse. Defendant Coloplast Corp. said of the acquisition that Coloplast Corp.'s market position in Surgical Urology and Female

Pelvic Health would immediately strengthen based on Mpathy's product portfolio including slings, mini-slings and meshes for stress urinary incontinence and pelvic floor repair and material portfolio including Smartmesh® technology.

39.     At relevant times, Coloplast Corp.'s website described its various products, including those for treating (i) "Pelvic Organ Prolapse" and (ii) "Stress Urinary Incontinence," including "Sling Procedures." A press release issued by Coloplast Corp. described Coloplast Corp.'s new corporate headquarters at 1601 West River Road in Minneapolis and stated that "Denmark-based Coloplast…selected north Minneapolis as the new home for its North American headquarters in 2006." According to the press release the new headquarters "will include one of the company's three global Innovation Centers."

40.     The Coloplast Defendants make the following statements regarding their products:

> [Aris has] Low rate of particle release from the sling-**minimizes increase in inflammatory response**. Atraumatic, smooth edges allow for easy passage during implantation. Macroporous design allows for optimal tissue integration

41.     Contrary to the Coloplast Defendants assertions that its products minimize increase in inflammatory response:

a.     In September of 2009, results from a study were published in the BMC Women's Health relating to the comparison of host response and complications in patients implanted with Coloplast's Aris. Implants from the Defendant's Aris group showed an **increase risk of erosion which was quantified at 4%.**

Kaelin-Gambirasio I, *Complications associated with transobturator sling procedures:analysis of 233 consecutive cases with a 27 months follow-up.* BMC Womens Health. 25; 9:28.

b.     In September of 2012, results from a study were published in the World Journal of Urology relating to the comparison of TVT vs TOT slings. 15 of 71 patients suffered adverse events including infection and erosion, **two thirds of which were implanted with Defendant's Aris.**

Wadie BS, *TVT versus TOT, 2-year prospective randomized study.* World J

Urol.2012 Sep 26.

42.     The Coloplast Defendants also make the following statements regarding their

products:

> Novasilk is one of the lightest weight, thinnest mesh's on the market, which translates into a more conforming mesh that may **reduce cases of inflammation, infection, or erosion** by having less implanted material.

43.     Contrary to the Coloplast Defendants assertions that its products are resistant to

significant inflammation, infection or erosion:

a.     Complications from mesh placement for pelvic organ prolapse include among other adverse events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into adjacent structures, and dyspareunia.

Cosson, M., et al., *Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which is the ideal material?* Int Urogynecol J pelvic Floor Dysfunct, 2003. 14(3): p. 169-78; discussion 178. Jones, K.A., et al., *Tensile properties of commonly used prolapse meshes.* Int Urogynecol J p e l v i c Floor Dysfunct, 2009. 20(7): p. 847-53. Margulies, R.U., et al., *Complications requiring reoperation following vaginal mesh kit procedures for prolapse.* Am J Obstet Gynecol, 2008. 199(6): p. 678 e1-4.

b.     Erosion can be defined as the mesh wearing, or slowly grinding through the vaginal wall. This is a serious complication and moreover, there is evidence that meshes shrink *in vivo* leading to increased stiffness, pain and poor restoration of the normal properties of the vagina. Dora, C.D., et al., *Time dependent variations in biomechanical properties of cadaveric fascia, porcine dermis, porcine small intestine submucosa, polypropylene mesh and autologous fascia in the rabbit model: implications for sling surgery.* J Urol, 2004. 171(5): p. 1970-3.

c.     Larger pores within polypropylene mesh materials, allowing macrophage and leukocyte migration, reduce infection.

Birch C, Fynes MM. The role of synthetic and biological prosthesis in reconstructive pelvic floor surgery. *Curr Opin Obstet Gynecol*. 2002; 14:527–595. 22. Govier FE, Kobashi KC, Kozlowski PM, Kuznetsov DD, Begley SJ, McGonigle KF, et al. High complication rate identified in sacrocolpopexy patients attributed to silicone mesh. *J Urol*. 2005;65:1099–1103.

d.     In a study published in August of 2012, The Coloplast Defendant's Novasilk was compared to other polypropylene on the market relating structural properties. Novasilk was found to have less porosity and increased stiffness than several of the other studied products supporting clinical observations

among Plaintiff' surgeons and the causative conclusion that properties of Defendant's mesh led to Plaintiff' complications.

Feola A, *Characterizing the ex vivo textile and structural properties of synthetic prolapse mesh products*. Int Urogynecol J. 2012 Aug 11.

44.     The Coloplast Defendants' products were unreasonably susceptible to degradation and fragmentation inside the body; shrinkage or contraction inside the body; intense foreign body reaction; chronic inflammatory response; chronic wound healing; chronic infections in and around the mesh fibers; nerve entrapment in the collagen scar formation.

45.     The Coloplast Defendants knew or should have known of these serious risks and should have, therefore, warned physicians and patients regarding these risks; to the extent they were known or knowable.

**C. Warnings Regarding the Risks of Defendants' Pelvic Mesh Products**

46.     On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health Notification that described over 1,000 complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to pelvic mesh products.

47.     Although the FDA notice did not identify the transvaginal mesh manufacturers by name, the FDA's MAUDE database indicates that the Defendants are the manufacturers of the pelvic mesh products that are the subject of the notification.

48.     On July 13, 2011, the FDA issued a new warning regarding serious complications associated with pelvic mesh products, including the products manufactured, marketed, and distributed by all Defendants. In this warning, the FDA indicated that "serious complications associated with surgical mesh for transvaginal repair of POP are not rare." (emphasis in the original). The FDA had also received increased reports of complications associated with the pelvic mesh products used in both pelvic organ prolapse and stress urinary

incontinence cases.

49.     The FDA Safety Communication also stated, "Mesh contraction (shrinkage) is a previously unidentified risk of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain."

50.     The FDA Safety Communication further indicated that the benefits of using pelvic mesh products instead of other feasible alternatives did not outweigh the associated risks. Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risks."

51.     Contemporaneously with the Safety Communication, the FDA released publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

52.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risks." (Emphasis in original).

53.     The White Paper further stated that "these products are associated with serious

adverse events . . . Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair." In its White Paper, the FDA advises doctors to, inter alia, "[r]ecognize that in most cases POP can be treated successfully without mesh thus avoiding the risk of mesh related complications." The White Paper concludes by stating that the FDA "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

54.     On August 25, 2011, Public Citizen, a consumer advocacy group, submitted a petition to the FDA seeking to ban the use of pelvic mesh products in pelvic repair procedures. In its Petition, Public Citizen warned that pelvic mesh products should be recalled because they offer no significant benefits, but expose patients to serious risks and the potential for permanent life-altering harm. Joining Public Citizen as co-petitioners were Dr. L. Lewis Wall, a professor of obstetrics and gynecology at Washington University in St. Louis, and Dr. Daniel S. Elliott, a urologic surgeon specializing in female urology at the Mayo Clinic in Rochester, Minnesota.

55.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the transvaginal mesh inside the body as a serious complication associated with transvaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . . Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

56.     The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk

individuals in whom the benefit of mesh placement may justify the risk."

57.     As is known to the Defendants, the risks associated with POP repair are the same as SUI repair. However, the data regarding the magnitude and frequency of these known risks are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its Section 522 Orders issued to manufacturers of pelvic mesh products used to treat SUI in January of 2012.

58.     In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with pelvic mesh products "indicate[] that serious complications can occur . . . [and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

59.     Defendants did not, and have not, adequately studied the extent of the risks associated with the products. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks.

60.     Defendants knew or should have known that the products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendants began marketing each of its pelvic mesh products, Defendants were aware that its pelvic mesh products were associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011, safety communication. Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in the Plaintiff is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile

prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' pelvic mesh products. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, causes chronic inflammation of the pelvic tissue, causes shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain, cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the polypropylene mesh.

61.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction."

62.     Defendants knew or should have known about the pelvic mesh products' risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

63.     Defendants also knew or should have known that: (1) some of the predicate products for the pelvic mesh products had high failure and complication rates, resulting in the recall of some of these predicate devices (including a medical device known as Protogen device); (2) that there were and are differences between the Defendants' pelvic mesh products and some or all of the predicate products, rendering them unsuitable for designation as

predicate products; (3) that significant differences exist and existed between the pelvic mesh products and their predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and (4) that the pelvic mesh products were and are causing numerous patients severe injuries and complications.

64.     The Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, and the patients. As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers and patients, into believing that the pelvic mesh products and the procedures for implantation were and are safe and effective, leading to the prescription for and implantation of the pelvic mesh products into plaintiff.

65.     Defendants also failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of their pelvic mesh products.

66.     Defendants failed to design and establish a safe, effective procedure for removal of the pelvic mesh products. Therefore, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the pelvic mesh products.

67.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for implantation have existed at all times relevant as compared to the Defendants' pelvic mesh products.

68.     The pelvic mesh products were at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physicians.

18

69.     Furthermore, the Defendants provided incomplete, insufficient, and misleading training and information to physicians, in order to increase the number of physicians utilizing the pelvic mesh products, and thus increase the sales of the pelvic mesh products, and also leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

70.     To this day, the Defendants' pelvic mesh products continue to be marketed to the medical community and to patients as safe, effective and reliable medical devices, implanted by safe, effective and minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of pelvic organ prolapse and stress urinary incontinence, and other competing products.

71.     Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of the products, and advertised, promoted, marketed, sold and distributed the products as safe medical devices when Defendants knew or should have known that the products were not safe for their intended purposes, and that the products would cause, and did cause, serious medical problems, and in some patients, including the Plaintiff, catastrophic injuries. Further, while some of the problems associated with the products were made known to physicians, the magnitude and frequency of these problems were not disclosed and were hidden from physicians.

72.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the products have high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff, making them defective under the law.

73.     The specific nature of the products' defects includes, but is not limited to, the following:

    a.    the use of polypropylene in the products and the adverse tissue reactions and host defense response that result from such material, causing adverse reactions and serious, permanent injuries including, but not limited to, painful recurrent erosions and associated intractable pain;

    b.    the design of the products to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries;

    c.    biomechanical issues with the design of the products which result in a non-anatomic condition leading to contraction or shrinkage of the mesh inside the body, that in turn causes surrounding tissue to become eroded, inflamed, fibrotic and infected, resulting in serious and permanent injury;

    d.    the propensity of the mesh design characteristics of the products for plastic deformation when subjected to tension both during implantation and once implanted inside the body which causes the mesh, or portions

thereof, to be encapsulated in a rigid scar plate which leads to nerve entrapment, bacterial entrapment, tissue destruction, enhanced inflammatory and fibrotic response and chronic pain;

e.     the propensity of the products to become rigid and inflexible, causing them to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing discomfort and pain with normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

f.     the propensity of the products for degradation or fragmentation over time, which causes an increased surface area that leads to enhanced chronic inflammatory and fibrotic reaction, causes a "barbed wire" or "saw blade" effect by the fragmented surface "sawing" through the tissue, leads to bacteria harboring in the fragmented, peeled and split fiber surface which in turn leads to chronic infections at the mesh surface, and results in continuing injury over time;

g.     the hyper-inflammatory responses to collagen leading to problems including chronic inflammatory response, chronic pain and fibrotic reaction as well as infections and other serious adverse events;

h.     the propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

i.     the harshness of collagen upon the female pelvic tissue, and the hardening of the product in the body; and

21

   j.  the inability of surgeons to effectively treat many of these conditions due to the integration of the mesh into the pelvic tissue and thus the inability to safely remove or excise the mesh once a complication occurs.

74.  The products are also defective due to Defendants' failure to adequately warn or instruct the Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

   a.  the products' propensities to contract, retract, and/or shrink inside the body;

   b.  the products' propensities for degradation, fragmentation and/or migration;

   c.  the products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

   d.  the frequency and manner of transvaginal mesh erosion or extrusion;

   e.  the risk of chronic inflammation resulting from the products;

   f.  the risk of chronic infections resulting from the products;

   g.  the risk of permanent vaginal or pelvic scarring as a result of the products;

   h.  the risk of de novo urinary dysfunction;

   i.  the risk of de novo dyspareunia or painful sexual relations;

   j.  the risk of recurrent, intractable pelvic pain and other pain resulting from the products;

   k.  the need for corrective or revision surgery to adjust or remove the

p r o d u c t s  which in some cases is not feasible nor possible;

l.      the severity of complications that could arise as a result of implantation of the products;

m.     the hazards associated with the products;

n.      the products' defects described herein;

o.      treatment of pelvic organ prolapse and stress urinary incontinence with the products is no more effective than feasible, available and safer alternatives;

p.      treatment of pelvic organ prolapse and stress urinary incontinence with the products exposes patients to greater risk than feasible, available and safer alternatives;

q.      treatment of pelvic organ prolapse and stress urinary incontinence with the products makes future surgical repair more difficult than feasible, available and safer alternatives;

r.      use of the products puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

s.      removal of the p r o d u c t s  due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

t.      complete removal of the p r o d u c t s  may not be possible and may not result in complete resolution of the complications, including pain.

**D. Plaintiff's Implant of the Defendants' Pelvic Mesh Product**

75.     On May 17, 2017, Plaintiff was implanted with a Coloplast Restorelle Y Contour pelvic mesh for pelvic organ prolapse.

76.     Dr. Keith Ramsey, M.D. performed the surgery at St. Catherine Hospital in East Chicago, Indiana.

77.     On July 26, 2017, Plaintiff was diagnosed with chronic inflammation and foreign-body giant cell reaction requiring excision of a portion of the Coloplast pelvic mesh.

78.     Dr. Keith Ramsey, M.D. performed the surgery at St. Catherine Hospital in East Chicago, Indiana.

79.     On December 12, 2017, Plaintiff was diagnosed with exposure of vaginal mesh, with erosion of the vaginal mesh into the surrounding tissue and mesh penetrating through the rectum requiring excision of a portion of the Coloplast pelvic mesh.

80.     Dr. Michael Heit, M.D. performed the surgery at Methodist Hospital in Indianapolis, Indiana.

81.     Following the removal of the Coloplast pelvic mesh, a colostomy was performed to remedy the rectal defect caused by the Coloplast pelvic mesh.

82.     Dr. Joshua Waters performed the colostomy at Methodist Hospital in Indianapolis, Indiana.

83.     On December 24, 2017, Plaintiff was diagnosed with dense adhesions and a closed-loop bowel obstruction arising from her previous surgeries.

84.     Dr. Bruce Robb performed an exploratory laparotomy with a reduction of the closed-loop bowel obstruction at Methodist Hospital in Indianapolis, Indiana.

85.     On April 3, 2018, Plaintiff underwent a reverse colostomy.

86.     Dr. Joshua performed the reverse colostomy at Methodist Hospital in Indianapolis, Indiana.

87.     Following the invasive surgeries on July 26, 2017, December 12, 2017, and

December 24, 2017, Plaintiff continues to suffer from severe and debilitating complications arising from her implant of the Coloplast pelvic mesh product.

88.     In addition, Plaintiff experienced pain, suffering and loss of enjoyment of life arising from the colostomy from December 12, 2017 to April 3, 2018.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

89.     Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

90.     Defendants had a duty to individuals, including the Plaintiff, to use reasonable care in designing, researching, manufacturing, marketing, labeling, packaging, supplying, distributing, and selling the products.

91.     Defendants were negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging and selling the products. Defendants breached their aforementioned duty by:

      a.    failing to design the products so as to avoid an unreasonable risk of harm to women in whom the products were implanted, including the Plaintiff;

      b.    failing to manufacture the products so as to avoid an unreasonable risk of harm to women in whom the products were implanted, including the Plaintiff;

      c.    failing to use reasonable care in the testing of the products so as to avoid an unreasonable risk of harm to women in whom the products were implanted, including the Plaintiff;

     d.       failing to use reasonable care in inspecting the products so as to avoid an unreasonable risk of harm to women in whom the products were implanted, including the Plaintiff; and

     e.       otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the products.

92.     The reasons that Defendants' negligence caused the products to be unreasonably dangerous and defective include, but are not limited to:

     a.       the use of polypropylene material in the products and the immune reaction that results from such material, causing adverse reactions and injuries;

     b.       the design of the products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

     c.       biomechanical issues with the design of the products, including, but not limited to, the propensity of the products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

     d.       the use and design of arms and anchors in the products, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

     e.       the propensity of the products for migration or to gradually elongate and deform when subject to prolonged tension inside the

body;

f.      the inelasticity of the p r o d u c t s , causing them to be improperly

mated to the delicate and sensitive areas of the pelvis where they are

implanted, and causing pain upon normal daily activities that involve

movement in the pelvis (e.g., intercourse, defecation);

g.      the propensity of the p r o d u c t s  for degradation or fragmentation

over time, which causes a chronic inflammatory and fibrotic reaction,

and results in continuing injury over time;

h.      the propensity of the p r o d u c t s  to cause long standing inflammatory

response altering the effective porosity of the mesh resulting in poor

outcomes including bridging fibrosis, compromise of tissues in contact

with or surrounding the mesh, erosion, nerve damage and resulting

neuromas; and

i.      the creation of a non-anatomic condition in the pelvis leading to

chronic pain and functional disabilities when the mesh is implanting

according to the manufacturers' instructions.

93.     Defendant also negligently failed to warn or instruct the Plaintiff and/or her

health care providers on issues including, but not limited to, the following:

a.      the products' propensities to contract, retract, and/or shrink inside the

body;

b.      the products' propensities for degradation, fragmentation and/or

migration;

c.      the products' inelasticity preventing proper mating with the pelvic

floor and vaginal region;

d.     the frequency and manner of mesh erosion or extrusion;

e.     the risk of chronic inflammation resulting from the products;

f.     the risk of chronic infections resulting from the products;

g.     the risk of permanent vaginal or pelvic scarring as a result of the products;

h.     the risk of de novo urinary dysfunction;

i.     the risk of de novo dyspareunia or painful sexual relations;

j.     the risk of recurrent, intractable pelvic pain and other pain resulting from the products;

k.     the need for corrective or revision surgery to adjust or remove the products which in some cases is not feasible nor possible;

l.     the severity of complications that could arise as a result of implantation of the products;

m.     the hazards associated with the products;

n.     the products' defects described herein;

o.     treatment of pelvic organ prolapse and stress urinary incontinence with the products is no more effective than feasible, available and safer alternatives;

p.     treatment of pelvic organ prolapse and stress urinary incontinence with the products exposes patients to greater risk than feasible, available and safer alternatives;

q.     treatment of pelvic organ prolapse and stress urinary incontinence with the products makes future surgical repair more difficult than

feasible, available and safer alternatives;

r.    use of the p r o d u c t s puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

s.    removal of the products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

t.    complete removal of the products may not be possible and may not result in complete resolution of the complications, including pain.

94.    As a result of these life-altering and, in some cases, permanent injuries, Plaintiff has suffered severe emotional pain and injury and has suffered and will suffer apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and multiple corrective surgeries as a result of implantation of mesh.

95.    Defendants likewise failed to conduct post-market vigilance or surveillance by:

a.    monitoring or acting on findings in the scientific and medical literature;

b.    monitoring or investigating and evaluating reports in the FDA adverse event databases for their potential significance for Defendants' pelvic mesh products;

c.    failing to comply with manufacturer requirements of the medical device; and

d.    reporting (MDR) Regulations, specifically:

    i.    failing to report MDRs (Medical Device [adverse event] Reports); and

    ii.    failing to investigate reports of serious adverse events.

96.    As a direct and proximate result of Defendants' negligence, the Plaintiff has

experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

97.     WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT II
## STRICT LIABILITY-DESIGN DEFECT

98.     Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

99.     The product implanted in the Plaintiff was not reasonably safe for its intended use and was defective as described herein with respect to its design. As previously stated, the product's design defects include, but are not limited to:

    a.     the use of polypropylene material and/or collagen material in the products and the immune reaction that results from such material, causing adverse reactions and injuries;

    b.     the design of the products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

    c.     biomechanical issues with the design of the products, including, but not limited to, the propensity of the products to contract or shrink inside the

30

body, that in turn cause surrounding tissue to be inflamed, become

fibrotic, and contract, resulting in injury;

d.    the use and design of arms and anchors in the products, which, when

placed in the women, are likely to pass through contaminated spaces

and injure major nerve routes in the pelvic region;

e.    the propensity of the p r o d u c t s  for migration or to gradually

elongate  and deform when subject to prolonged tension inside the

body;

f.    the inelasticity of the p r o d u c t s, causing them to be improperly

mated to the delicate and sensitive areas of the pelvis where they are

implanted, and causing pain upon normal daily activities that involve

movement in the pelvis (e.g., intercourse, defecation);

g.    the propensity of the p r o d u c t s  for degradation or fragmentation

over time, which causes a chronic inflammatory and fibrotic reaction,

and results in continuing injury over time;

h.    the hyper-inflammatory responses to collagen leading to problems

including chronic pain and fibrotic reaction;

i.    the propensity of the collagen products to disintegrate after

implantation in the female pelvis, causing pain and other adverse

reactions;

j.    the adverse tissue reactions caused by the collagen products, which are

causally related to infection, as the collagen is a foreign organic

material;

31

k.      the harshness of collagen upon the female pelvic tissue, and the hardening of the product in the body; and

l.      the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

100.    As a direct and proximate result of the product's aforementioned defects as described herein, the Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo future medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

101.    Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

102.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**COUNT III**
**STRICT LIABILITY – MANUFACTURING DEFECT**

103.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

104.    The product implanted in the Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law with respect to its manufacture, in that it deviated materially from Defendants' design and manufacturing

specifications in such a manner as to pose unreasonable risks of serious bodily harm to the Plaintiff.

105.    As a direct and proximate result of the product's aforementioned defects as described herein, the Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

106.    Defendant is strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product(s).

107.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT IV
## STRICT LIABILITY – FAILURE TO WARN

108.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

109.    The product implanted in the Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law due to their lack of appropriate and necessary warnings. Specifically, Defendants did not provide sufficient or adequate warnings.

110.    As a direct and proximate result of the product's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo

further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

111.    Defendant is strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

112.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**COUNT V**
**STRICT LIABILITY – DEFECTIVE PRODUCT**

113.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

114.    At the time of Plaintiff's injuries, the Defendants' pelvic mesh products were defective and unreasonably dangerous to foreseeable consumers, patients, and users, including Plaintiff, and the warnings labels, and instructions were deficient.

115.    The Defendants' pelvic mesh products are dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their health care providers.

116.    Plaintiffs bring strict product liability claims under the common law, Section 402A of the Restatement of Torts (Second), and/or Restatement of Torts (Third) against Defendants.

117.    As a proximate result of the Defendants' design, manufacture, marketing, sale, and distribution of the pelvic mesh products, Plaintiff has been injured and sustained

severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

118.     WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

119.     Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

120.     Defendants made assurances as described herein to the general public, hospitals and health care professionals that the p r o d u c t s were safe and reasonably fit for their intended purposes.

121.     The Plaintiff and/or her healthcare provider chose the products based upon Defendants' warranties and representations as described herein regarding the safety and fitness of the products.

122.     The Plaintiff, individually and/or by and through her physician, reasonably relied upon Defendants' express warranties and guarantees that the products were safe, merchantable, and reasonably fit for their intended purposes.

123.     Defendants breached these express warranties because the product implanted in the Plaintiff were unreasonably dangerous and defective as described herein and not as Defendants had represented.

124.     Defendants' breach of their express warranties resulted in the implantation of an unreasonably dangerous and defective product in the body of the Plaintiff, placing said

35

Plaintiff's health and safety in jeopardy.

125.     As a direct and proximate result of Defendants' breach of the aforementioned express warranties, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

126.     WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

127.      Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

128.     Defendants impliedly warranted that the product was merchantable and was fit for the ordinary purposes for which it was intended.

129.     When the p r o d u c t  was implanted in the Plaintiff to treat her pelvic organ prolapse, the product was being used for the ordinary purpose for which it was intended.

130.     The Plaintiff, individually and/or by and through her physician, relied upon Defendants' implied warranties of merchantability in consenting to have the product implanted in her.

131.     Defendants breached these implied warranties of merchantability because the product implanted in the Plaintiff was neither merchantable nor suited for its intended use as

warranted.

132.    Defendants' breach of their implied warranties resulted in the implantation of unreasonably dangerous and defective products in the body of the Plaintiff, placing said Plaintiff's health and safety in jeopardy.

133.    As a direct and proximate result of Defendants' breach of the aforementioned implied warranties, the Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

134.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VIII
## FRAUDULENT CONCEALMENT

135.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

136.    Throughout the relevant time periods, it was known or knowable to Defendants that their pelvic mesh products caused large numbers of complications that were not rare. Moreover, it was known or knowable to Defendants that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with these devices. It was known or knowable to Defendants that the safety and efficacy of its pelvic mesh products had not been proven with respect to, among other things, the product, its

components, its performance and its method of insertion. It was known or knowable to Defendant that there was no evidence that its pelvic mesh products were safe and effective and, in fact the evidence that was known or knowable to Defendants was that its pelvic mesh products were not safe and effective. Defendants continued to represent that their pelvic mesh products were safe and effective.

137.    Despite what was known or knowable to Defendants about the lack of safety and efficacy of its pelvic mesh products through the relevant time periods, Defendants failed to disclose this information to the Plaintiff, to their physicians or to the public at large.

138.    Despite this knowledge, Defendants continued to market and sell their pelvic mesh products and procedures as being safe and efficacious with evidence to the contrary. Additionally, Defendants wrongfully and intentionally, through their physician training program, provided physicians with the comfort that they had sufficient training, consistent with the 2008 FDA PHN, to minimize or eliminate adverse effects resulting from the devices.

139.    At all times mentioned herein, Defendants, and each of them, had the duty and obligation to disclose to Plaintiff and to her physicians, the true facts concerning the aforesaid products, that is, that said products were dangerous and defective, lacking efficacy for its purported use and lacking safety in normal use, and how likely it was to cause serious consequences to users including permanent and debilitating injuries. Defendants concealed these material facts prior to the time that Plaintiff were implanted with Defendants' pelvic mesh product.

140.    Defendants were under a duty to Plaintiff to disclose and warn of the defective nature of the product because:

a.    Defendants were in a superior position to know the true quality, safety
      and efficacy of the Defendants' pelvic mesh products;

b.    Defendants knowingly made false claims about the safety and quality
      of the Defendants' pelvic mesh products in the documents and
      marketing materials Defendants provided to the FDA, physicians, and
      the general public; and

c.    Defendants fraudulently and affirmatively concealed the defective
      nature of the Defendants' pelvic mesh products from Plaintiff.

141.    The facts concealed and/or not disclosed by Defendants to Plaintiff were
material facts that a reasonable person would have considered to be important in deciding
whether or not to purchase and/or use the Defendants' pelvic mesh products.

142.    At all times herein mentioned, Defendants, and each of them, willfully,
intentionally, and maliciously concealed facts as set forth above from Plaintiff and their
physicians, and therefore, Plaintiff, with the intent to defraud as herein alleged.

143.    Defendants intentionally concealed and/or failed to disclose the true
defective nature of the products so that Plaintiff would request and purchase the Defendants'
pelvic mesh products, and that her healthcare providers would dispense, prescribe, and
recommend the Defendants' pelvic mesh products, and Plaintiff justifiably acted or relied
upon, to her detriment, the concealed and/or non-disclosed facts as evidenced by her purchase
of the Defendants' pelvic mesh products.

144.    At all times herein mentioned, neither Plaintiff nor her physicians were
aware of the facts set forth above, and had they been aware of said facts, they would not have
acted as they did, that is, would not reasonably relied upon said representations of safety and

efficacy and utilized the pelvic mesh products for treatment of stress urinary incontinence and pelvic organ prolapse.

145.     Defendants' failure to disclose this information was a substantial factor in Plaintiff's physicians selecting Defendants' pelvic mesh product and procedures for treatment of pelvic organ prolapse. This failure to disclose also resulted in the provision of incorrect and incomplete information to the Plaintiff-patient. As a direct and proximate result of this conduct, Plaintiff was injured.

146.     WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**COUNT IX**
**CONSTRUCTIVE FRAUD**

147.     Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

148.     Defendants are in a unique position of knowledge concerning the quality, safety and efficacy of the Defendants' pelvic mesh products, which knowledge is not possessed by Plaintiff or her physicians, and Defendants thereby hold a position of superiority over Plaintiff and her physicians.

149.     Despite their unique and superior knowledge regarding the defective nature of the Defendants' pelvic mesh products, Defendants continue to suppress, conceal, omit, and/or misrepresent information to Plaintiff, the medical community, and/or the FDA, concerning the severity of risks and the dangers inherent in the intended use of the Defendants' pelvic mesh products, as compared to other products and forms of treatment.

150.   For example, scientists in the recent study published in Obstetrics & Gynecology, August, 2010 found that the complication rate was so high that the clinical trial was halted early.

151.   Defendants have concealed and suppressed material information, including limited clinical testing, that would reveal that the Defendants' pelvic mesh products had a higher risk of adverse effects, in addition to, and exceeding those associated with alternative procedures and available devices. Instead, Defendants have misrepresented the safety and efficacy of the products.

152.   Upon information and belief, Defendants' misrepresentations are designed to induce physicians and Plaintiff to prescribe, dispense, recommend and/or purchase the Defendants' pelvic mesh products. Plaintiff and the medical community have relied upon Defendants' representations.

153.   Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiff and their medical providers and engaged in constructive fraud in their relationship with Plaintiff and their medical providers. Plaintiff reasonably relied on Defendants' representations.

154.   As a proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

155.   WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**COUNT X**
**NEGLIGENT MISREPRESENTATION**

156.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

157.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, and the public, that its pelvic mesh products had not been adequately tested and found to be safe and effective for the treatment of incontinence and prolapse. The representations made by Defendants, in fact, were false.

158.    Defendants failed to exercise ordinary care in the representations concerning the pelvic mesh products while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the pelvic mesh products' high risk of unreasonable, dangerous, adverse side effects.

159.    Defendants breached their duty in representing that the Defendants' pelvic mesh products have no serious side effects different from older generations of similar products and/or procedures to Plaintiff, Plaintiff' physicians, and the medical and healthcare community.

160.    As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the pelvic mesh products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, erosion, pain and suffering, surgery to remove the products, and other severe and personal injuries, which are permanent and lasting in nature.

161.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

162.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT XI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

163.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

164.    Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold the Defendants' pelvic mesh product to Plaintiff, carelessly and negligently concealing the harmful effects of the Defendants' pelvic mesh products from Plaintiff, and carelessly and negligently misrepresented the quality, safety and efficacy of the products.

165.    Plaintiff was directly impacted by Defendants' carelessness and negligence, in that Plaintiff has sustained and will continue to sustain emotional distress, severe physical injuries, economic losses, and other damages as a direct result of being implanted with the pelvic mesh products sold and distributed by Defendants and/or because of the nature of their relationship to the individual implanted with the pelvic mesh products.

166.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

167.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT XII
## VIOLATION OF INDIANA DECEPTIVE TRADE PRACTICES LAWS

168.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

169.    Plaintiff purchased and used the Defendants' pelvic mesh product for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of Indiana Deceptive Trade Practices laws, sections 24-5-0.5-1 *et seq.*

170.    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for the Defendants' pelvic mesh product, and would not have incurred related medical costs and injury.

171.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, monies from Plaintiff for the pelvic mesh product that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

172.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

        a.      representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;

        b.      advertising goods or services with the intent not to sell them as advertised; and,

        c.      engaging in fraudulent or deceptive conduct that creates a likelihood of

confusion or misunderstanding.

173.    Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell the Defendants' pelvic mesh products. Each aspect of Defendants' conduct combined to artificially create sales of the Defendants' pelvic mesh products.

174.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Defendants' pelvic mesh products.

175.    Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the product, and would not have incurred related medical costs.

176.    Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of Indiana law.

177.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of Indiana law.

178.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of Indiana law.

179.    Under Indiana deceptive trade practices law, which protects consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are

subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

180.    Defendants violated Indiana law which was enacted to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the Defendants' pelvic mesh products were fit to be used for the purpose for which they were intended, when in fact they were defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

181.    The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under Indiana law to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

182.    Defendants had actual knowledge of the defective and dangerous condition of the Defendants' pelvic mesh products and failed to take any action to cure such defective and dangerous conditions.

183.    Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which product and/or procedure to undergo and/or perform.

184.    Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

185.    By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiffs have suffered ascertainable losses and damages.

186.    As a direct and proximate result of Defendants' violations of Indiana law,

Plaintiffs have sustained economic losses, injuries and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

187.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request restitution and disgorgement of profits, together with interest, cost of suit, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT XIII
## GROSS NEGLIGENCE

188.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

189.    Defendants' conduct was willful and wanton, showing an utter indifference to or conscious regard for the safety of others, the public, and Plaintiff for which the law would allow, and which Plaintiff will seek at the appropriate time under governing law for the imposition of punitive damages, in that Defendants' conduct, when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or included a material representation that was false, with Defendants, knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

190.    Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

191.    Plaintiffs therefore will seek to assert claims for punitive damages at the

appropriate time under governing law in an amount within the jurisdictional limits of the Court.

192.    Plaintiffs also allege that the acts and omissions of named Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiff. In that regard, Plaintiffs will seek punitive damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

193.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT XIV
## UNJUST ENRICHMENT

194.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

195.    Defendants are, and at all times relevant, were the manufacturers, sellers, and/or suppliers of the Defendants' pelvic mesh products.

196.    Plaintiff paid for the Defendants' pelvic mesh product for the purpose of treatment of pelvic organ prolapse.

197.    Defendants have accepted payment by Plaintiff and others on Plaintiff's behalf for the purchase of the Defendants' pelvic mesh product.

198.    Plaintiff has not received the safe and effective medical device for which she paid.

199.    It would be inequitable for Defendants to keep this money since Plaintiff did

not in fact receive a safe and effective medical device as represented by Defendants.

200.    WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**COUNT XV**
**PUNITIVE DAMAGES**

201.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

202.    Defendants sold their products to the healthcare providers of the Plaintiff and other healthcare providers in the state of Indiana and throughout the United States without doing adequate testing to ensure that the products were reasonably safe for implantation in the female pelvic area.

203.    Defendants sold the products to the Plaintiff's health care providers and other health care providers in the state of Indiana and throughout the United States in spite of their knowledge that the products can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this complaint, thereby causing severe and debilitating injuries suffered by the Plaintiff and numerous other women.

204.    Defendants ignored reports from patients and health care providers throughout the United States and elsewhere of the products' failures to perform as intended, which lead to the severe and debilitating injuries suffered by the Plaintiff and numerous other women. Rather than doing adequate testing to determine the cause of these injuries, or to rule out the products' designs or the processes by which the products are manufactured as the cause of these injuries, Defendants chose instead to continue to market and sell the products as safe

and effective.

205.    Defendants knew the products were unreasonably dangerous in light of their risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the p r o d u c t s , as well as other severe and personal injuries which were permanent and lasting in nature.

206.    Defendants withheld material information from the medical community and the public in general, including the Plaintiff, regarding the safety and efficacy of the products.

207.    Defendants knew and recklessly disregarded the fact that the products caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat pelvic organ prolapse and stress urinary incontinence.

208.    Defendants misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the products.

209.    Notwithstanding the foregoing, Defendants continue to aggressively market the products to consumers, without disclosing the true risks associated with the products.

210.    Defendants knew of the p r o d u c t s ' defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the p r o d u c t s so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff.

211.    Defendants continue to conceal and/or fail to disclose to the public, including the Plaintiff, the serious complications associated with the use of the products to ensure continued and increased sales of the products.

212.    Defendants' acts were willful or outrageous due to evil motive or a reckless

indifference to the rights of others, which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## COUNT XVII
## LOSS OF CONSORTIUM

213.    Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein.

214.    As a direct and proximate result of the above-described injuries sustained by Plaintiff, her spouse, Avishoov Roberts, has suffered a loss of spousal consortium, companionship, society, affection, services and support.

215.    WHEREFORE, Plaintiff Avishoov Roberts demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

A.  compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiffs, health and medical care costs, loss of consortium, together with interest and costs as provided by law;

B.  restitution and disgorgement of profits;

C.  reasonable attorneys' fees;

51

D.  the costs of these proceedings;

E.  economic damages;

F.  medical monitoring damages;

G.  punitive damages;

H.  such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury as to all issues.

Dated:  January 25, 2019

                    Respectfully submitted,

**FLINT LAW FIRM LLC**

/s/ *Jacob A. Flint*
Jacob A. Flint, IL bar #6299777
Andrew Feldman, IL bar #6292797
Flint Law Firm LLC
222 E. Park St., suite 500
Edwardsville, IL 62025
Phone: 618-288-4777
Fax: 618-288-2864
jflint@flintlaw.com

**CUSTY LAW FIRM LLC**

/s/ *Brian Custy*
Brian Custy, IN bar#26329-64
Custy Law Firm LLC
4004 Campbel St., Suite 4
Valparaiso, IN 46385
Phone:  219-286-7361
bcusty@custylaw.com

COUNSEL FOR PLAINTIFFS